IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| J. AMBROGI FOOD DISTRIBUTION, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| TEAMSTERS LOCAL UNION NO. 929 | : | NO.   21-1907 |

## MEMORANDUM

**Padova, J.**                                                              **December 11, 2023**

Plaintiff J. Ambrogi Food Distribution, Inc. ("JAF") commenced this action against Defendant Teamsters Local Union No. 929 (the "Union"), asserting claims for breach of the parties' collective bargaining agreements ("CBAs") and declaratory relief.   The claims primarily arise out of the Union's discussions of a strike in the Spring of 2021 and an alleged work stoppage on May 1, 2021, all of which JAF contends violated the CBAs' no-strike provisions.   After extensive discovery, the Union filed a Motion for Summary Judgment.   We held argument on the Motion on September 20, 2023.   For the following reasons, we now grant the Motion and enter judgment in the Union's favor.

## I.       BACKGROUND

### A.       Facts

The summary judgment record contains the following undisputed facts.   JAF's primary business is the distribution of fruits and vegetables.   (Jt. Statement of Undisputed Material Facts ("Jt. Facts") ¶ 29.)   In May of 2021, the Union represented four bargaining units at JAF's facility in West Deptford, New Jersey.   (Id. ¶ 7.)   The four bargaining units are (1) delivery drivers, (2) packers/custodians, (3) pullers, and (4) warehouse workers.   (Id. ¶ 8.)   Each bargaining unit is governed by a separate CBA, which sets forth the bargaining unit's terms and conditions of employment.   (Id. ¶ 8.)   The terms of the CBAs at issue were June 1, 2017 to June 30, 2022.   (Id.

¶ 20.)   Employees in the bargaining units were obligated to join the Union, and there were about 91 employees in the four bargaining units.   (Id. ¶ 16.)

The relevant provisions of the four CBAs are identical.[1]   (Id. ¶ 19.)   Each CBA contains a grievance-arbitration procedure in Article 15, which states that "All grievances or disputes arising under the terms of this Agreement shall be handled in accordance with the manner provided in this Article."   (CBA, Union Ex. E, at Art. 15; Jt. Facts ¶ 21.)   More specifically, it states that "[i]n the case of grievances presented either by the Local Union or the Employer arising under the terms of this Agreement involving general interpretation of the Agreement or of general or uniform operations hereunder," "the matter shall be adjusted, if possible, by negotiations between the officers and representatives of the Union and the designated representatives of the Employer." (CBA at Art. 15 ¶ 1.)   If the Union and Employer are unable to adjust the matter through negotiations, the CBA provides that the matter shall be submitted to arbitration in accordance with the rules of the American Arbitration Association, and "[t]he decision of the arbitrator shall be final and binding upon the parties."   (Id. Art. 15 ¶ 2.)   Each CBA also contains a no-strike provision, which states: "Except for the failure of the Employer to abide by an arbitration award after a decision by the arbitrator, the **Union agrees that there shall be no strikes, stoppages of work, or slowdowns, for any reason whatsoever during the term of this Agreement**."   (Id. Art. 15 ¶ 3 (emphasis added)).

Kristy's Kuts, Inc. is a company with common ownership with JAF.   (Jt. Facts ¶ 35.) Kristy's Kuts' business involves the cutting and packaging of fruits and vegetables.   (Id. ¶ 38.) The Union represented employees at Kristy's Kuts pursuant to a CBA that was set to expire on

---

[1]  Because the four CBAs are identical, the parties mostly refer to CBA in the singular and cite to only one of the four CBAs for the common provisions.   (See Jt. Facts ¶ 19.)   We will do the same.

April 30, 2021.  (Id. ¶ 39.)   On February 11, 2021, Kristy's Kuts advised Union President Rocky Bryan that a majority of its bargaining unit no longer wanted Union representation.  (Id. ¶ 40.) In response, Bryan wrote a February 12, 2021 email to JAF President Kristy Ambrogi, in which he stated that unless Kristy's Kuts had a successor CBA in place by April 30, 2021, the Union would strike, "including extending picket line [sic] whenever and wherever necessary."  (Id. ¶¶ 41-42.)

In March and April of 2021, the Union convened outside of JAF and Kristy's Kuts' facilities on several occasions with a large inflatable rat.  (Id. ¶¶ 43-44.)   On March 23, 2021, JAF Operations Manager Brian Stocklin told Kristy Ambrogi "that he heard rumors from at least one employee that the Union was talking about having a strike."  (Id. ¶ 51.)   JAF's lawyer sent a letter to the Union on March 24, 2021, stating that JAF had heard reports that the Union "intend[ed] to instigate a work stoppage."  (Id. ¶ 52.)   JAF's counsel threatened to sue the Union for money damages for any business lost as a result of a work disruption and stated that such damages would "likely run into the millions of dollars."  (Id. ¶ 53.)   The Union's counsel responded in a March 29, 2021 letter that the Union had "made no threat of engaging in a strike or slowdown" and suggested that JAF "rely on communications made by the Union's leadership and counsel, instead of rumors and gossip."  (Id. ¶ 54.)   Union counsel also responded to JAF's counsel's claim that a strike would violate the CBA, asserting that "Article 5 clearly states that it is not a violation of the agreement if employees refuse to enter property or cross a picket line of an employer with whom the Union is involved in a labor dispute," and "also permits the drivers to refuse to carry struck goods."  (Id. ¶ 55; see also CBA at Art. 5 ¶ 1 ("It shall not be a violation of this Agreement, and it shall not be cause for discharge or disciplinary action nor shall such employee be permanently replaced in the event an employee refuses to enter upon any property involved in a

primary labor dispute, or refuses to go through or work behind any primary picket line, including the primary picket line of Unions party to this Agreement, and including primary picket lines at the Employer's places of business.").)

In March of 2021, Union shop stewards had a conversation with Kristy Ambrogi, Stocklin, and JAF Human Resources Director Michael Blimm, about a "potential strike." (Jt. Facts ¶¶ 56, 76.) In late March 2021, JAF puller Dennis Havers also told Stocklin that the union was planning to strike. (Id. ¶ 57.) During the last week of March, Kristy Ambrogi instructed Blimm to research companies to provide temporary staffing in case of a strike. (Id. ¶ 76.) On April 15, 2021, JAF entered into a Service Agreement with a staffing agency, STS of NYS, Inc. ("STS"), for temporary replacement workers. (Id. ¶¶ 77, 84.) JAF paid STS a non-refundable deposit of $25,000 on April 16, 2021. (Id. ¶¶ 86-87.) On April 15, 2021, JAF also made a decision to hire a security firm. (Id. ¶ 99.)

One week prior, on April 8, 2021, Bryan submitted a Request for Approval of Strike Benefits Assistance ("SBA2") to the appropriate Joint Council and Trade Division/Conference. (Id. ¶¶ 68, 70.) That request, which must be submitted just prior to or immediately after a strike occurs, stated that the proposed date of the strike was May 1, 2021, and stated that the Union would be holding a meeting on April 25, 2021. (Id. ¶¶ 71, 73-74.) Five days later, on April 13, 2021, Bryan submitted a "Notification of Any Contemplated Action and Request for Procedural Recognition Prior to Action ('SBA1')," which is the initial step taken by a union to notify the International Brotherhood of Teamsters of a pending strike, and requested recognition of the strike so that bargaining unit employees could receive strike funds. (Id. ¶¶ 62-63.)

On April 19, 2021, JAF Drivers and Union Shop Stewards Anthony Polis and Greg Palestini discussed strikes with Kristy Ambrogi, Stocklin, Blimm, and JAF Vice President Michael

Ambrogi, who told the Union workers that it was illegal to strike.   (Id. ¶ 58.)   At Bryan's direction, the Union prepared and mailed a flyer to employees titled "Update Notice of Pending Strike," which informed employees of both JAF and Kristy's Kuts that there was a meeting scheduled for April 25, 2021.   (Id. ¶¶ 80, 82; Update Notice, JAF Ex. B.)   Someone left that flyer on Stocklin's desk, and he gave the flyer to Kristy Ambrogi.   (Jt. Facts ¶¶ 81, 83.)   On April 25, 2021, the Union held the scheduled membership meeting to discuss picketing and a possible strike. (Id. ¶ 79.)   Bryan told those in attendance that the Union might initiate a strike.   (Id. at 15 ¶ 86.)[2] Michael Hammond, a JAF driver, testified at his deposition that Bryan said at the meeting that "if [members] don't participate in the strike, [they're] not going to get to be in the union."   (Jt. Facts ¶ 93 (alterations in original); see also Hammond Dep., Union Ex. N, at 19).)   In late April, 2021, Bryan posted a green flyer on the Union's cork board at the Philadelphia Market stating, "On Saturday May 1st Local 929 Will Be Picketing J. Ambrogi Food."   (Jt. Facts ¶¶ 94, 105; Green flyer, JAF Ex. C.)   JAF learned of this notice in late April "from a non-bargaining unit JAF employee who saw it and sent a picture of it to JAF."   (Jt. Facts ¶ 106.)

On April 25, 2021, JAF verbally finalized a Security Agreement with LMC Security ("LMC") and, two days later, on April 27, 2021, it entered a written agreement with LMC to provide security personnel on May 1, 2021.   (Id. ¶¶ 100-01.)   The minimum amount for the LMC contract was $47,201.00, which was a non-refundable security guarantee.   (Id. ¶¶ 102-03.)   JAF wired that amount to LMC on April 28, 2021.   (Id. ¶ 104.)   Also on April 28, 2021, STS replacement workers began training to drive JAF delivery routes in the event of a strike.   (Id. ¶ 107.)

---

[2] The Joint Stipulated Facts contain two paragraphs 86.   This is the second one, which appears on page 15.

On April 27, 2021, JAF driver and assistant Union shop steward Jimmy Sparks had a discussion with Stocklin about "employees not reporting to work during the Union's planned strike" and "Sparks' understanding from . . . Rocky Bryan that JAF employees would be fined or expelled from the Union if they came to work during the . . . strike."   (Id. ¶ 60.)   Also on April 27, 2021, JAF driver Greg Girard had a discussion with Stocklin regarding the Union's "plan to conduct a strike."   (Id. ¶ 61.)

Twenty-nine Union drivers were scheduled to work for JAF on May 1, 2021.   (Id. ¶ 112.) Only two drivers did not report to work as scheduled.   (Id. ¶ 113.)   The first, JAF driver Paul Whalin, called off at 5:05 a.m. for his 5:00 a.m. shift.   (Id. ¶ 114.)   He told dispatch that he was calling off because of the Union strike, although he called back and changed his reason to "car trouble," because "he did not want to get in trouble with the Union and the Company."   (Id. ¶ 116; see also Whalin Dep., Union Ex. S, at 27-29, 42-43.)   He subsequently explained that he thought that the Union was striking that day "because '[t]hey were talking about it.'"   (Jt. Facts ¶ 130 (quoting Whalin Dep. at 23).)   The second Union driver who did not report to work as scheduled was JAF driver Michael Hammond, who came to work 45 minutes late and told Kristy Ambrogi and Stocklin that he did not come in on time because he thought there would be a strike and that the Union had made him look like an "asshole" because he thought the Union was striking.   (Id. ¶ 118 and n.114; Hammond Dep., Union Ex. N, at 27-29.)

Neither Whalin nor Hammond were disciplined for their call-offs.   (Jt. Facts ¶¶ 117, 120.) Both testified that the Union had said that if there was a giant inflatable rat in front of JAF, that meant that the Union was on strike.   (Id. ¶ 121-22.)   Neither, however, saw a giant inflatable rat on May 1, 2021.   (Id. ¶¶ 123-24.)   In addition, neither Whalin nor Hammond saw any Union officer at the JAF facility on May 1, 2021, and neither had seen the green flyer at the Philadelphia

Market announcing picketing.   (Id. ¶¶ 126-29; Hammond Dep. at 23, 35; Whalin Dep. at 25-26, 44.)   JAF used two drivers provided by STS to cover Hammond's and Whalin's delivery routes on May 1, 2021.   (Jt. Facts ¶ 143.)   On other occasions, when a bargaining unit driver calls out, JAF makes sure the route is covered by calling in either another bargaining unit driver or a non-bargaining unit individual to cover the route.   (Id. ¶¶ 33-34.)   JAF paid a total of $662,153.14 to STS, and paid $47,201.00 to LMC.   (Id. ¶¶ 147, 149.)

**B.    Procedural Background**

JAF filed its original Complaint in this action on April 26, 2021, and it asked for damages for breach of the CBAs and a declaration that the Union's "pending strike" would similarly violate the CBAs.   (Compl., Docket No. 1, at 10 ¶ B.)   This Complaint was served on the Union on April 29, 2021, before Whalin and Hammond called out of work on May 1.   (See Docket No. 6.)   On May 17, 2021, the Union filed a Motion to Dismiss, in which it argued, inter alia, that no strike had occurred.   (See Docket No. 8.)

JAF filed an Amended Complaint "for Damages and Other Equitable Relief" on May 28, 2021.   (Am. Compl., Docket No. 9.)   Like the original Complaint, the Amended Complaint contains claims for damages (Count 1) and declaratory relief (Count 2) pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., and Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.   Count 1 asserts that the Union violated (and repudiated) the CBAs because it "instigated and will continue to instigate intermittent strikes and/or stoppages of work." (Am. Compl. ¶¶ 40-42; see also id. at 11 ¶ C (seeking judgment finding "that the Union has violated the CBA by threatening and ordering a strike and/or stoppage of work at JAF").)   The Amended Complaint alleges that JAF suffered damages of $3 million to $4 million in anticipation of continuing violations of the CBAs, although it now appears that JAF primarily seeks to recover

only its costs of hiring STS and LMC.   (Id. ¶ 43; Kristy Ambrogi Dep., Union Ex. O, at 72.)

Count 2 of the Amended Complaint seeks a declaratory that Article 5 of the CBAs "does not permit

the Union to order, maintain, sanction, or permit a strike or stoppage of work at JAF."   (Am

Compl. ¶ 50.)

The Union filed a Motion to Dismiss the Amended Complaint for either lack of jurisdiction

or failure to state a claim on which relief can be granted, which was denied on March 29, 2022.

Thereafter, discovery commenced and continued for a year, through March of 2023.   The Union

then filed the instant Motion for Summary Judgment.   We held argument on the Motion on

September 20, 2023.

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P.

56(a).   An issue is "genuine" when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."

Id.   In ruling on a summary judgment motion, we consider "the facts and draw all reasonable

inferences in the light most favorable to . . . the party who oppose[s] summary judgment."   Jacobs

v. Cumberland Cnty., 8 F.4th 187, 192 (3d Cir. 2021) (citing Bland v. City of Newark, 900 F.3d

77, 83 (3d Cir. 2018)).   If a reasonable fact finder could find in the nonmovant's favor, summary

judgment may not be granted.   Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 130 (3d

Cir. 2002) (citation omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of [the record] which it

believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials [that the moving party has cited] do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1).   Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.   However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010) (citing Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989)).

## III.   DISCUSSION

The Union seeks summary judgment in its favor on both of JAF's claims.   It also argues that JAF failed to exhaust its available contractual remedies pursuant to the CBA's grievance and arbitration provisions and that the court should therefore dismiss this action and order it to proceed pursuant to the CBA's arbitration provisions.   As the failure to exhaust is a threshold issue, we address it before moving on to the Union's other arguments.

### A.     Failure to Exhaust

The Union argues that the court should order JAF to utilize the grievance process set forth in the CBA, which requires final and binding arbitration of contractual disputes.   JAF, however,

maintains that the Union has waived this argument by failing to raise it earlier.

Section 301(a) of the LMRA states, in relevant part:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).   While this provision gives federal courts jurisdiction over labor disputes involving the breach of a CBA, the "primacy of arbitral resolution of industrial disputes [remains the LMRA's] centerpiece."   Voilas v. Gen. Motors Corp., 170 F.3d 367, 372 (3d Cir. 1999) (citing Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 455-56 (1957)).   In this regard, the LMRA provides that "final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective bargaining agreement."   29 U.S.C. § 173(d).   Moreover, "it has been established that where the [CBA] contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."   AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986) (quotation omitted) (citation omitted).

In this case, as noted above, Article 15 of the CBA includes a grievance procedure to resolve disputes arising from a breach of the Agreement.   It provides in pertinent part that:

> **All grievances or disputes arising under the terms of this Agreement shall be handled in accordance with the manner provided in this Article.**
>
> 1. Grievances must be reduced to writing and presented within five (5) working days of their occurrence. . . .   [T]he matter shall be

adjusted, if possible by negotiations between the officers and representatives of the Union and the designated representatives of the Employer.  In the case of grievances presented either by the Local Union or the Employer arising under the terms of this Agreement involving general interpretation of the Agreement or of general or uniform operations hereunder, or affecting all or a substantial number of the employees generally, the procedure set forth in the immediately preceding sentence shall be followed initially.

2.  . . . . If [the] matter cannot be adjusted by the representatives of the Employer and the Local Union, then it may be submitted to arbitration in accordance with the rules of the American Arbitration Association.  The decision of the arbitrator shall be final and binding upon the parties to this agreement.

(CBA at Art. 15 (emphasis added).)

Here, the Union argues that the JAF's claims are for breach of the CBA and that JAF was therefore required to obtain relief through final and binding arbitration, which can provide JAF full relief.   The Union relies on United Paperworkers International Union v. Misco, Inc., 484 U.S. 29 (1987), which states that "courts have jurisdiction to enforce collective bargaining-contracts; but where the contract provides grievance and arbitration procedures, those procedures must first be exhausted and the court must order resort to the private settlement mechanisms without dealing with the merits of the dispute."   Id. at 37.   The Union therefore maintains that we should dismiss this action and require JAF to utilize the CBA's grievance and arbitration process.

JAF does not deny that its claims in this case could be resolved through the CBA's grievance and arbitration procedures.   Instead, JAF asserts that the Union has waived its right to seek arbitration because its "demand for arbitration comes long after the suit commenced and [after] both parties have engaged in extensive discovery."   Zimmer v. CooperNeff Advisors, Inc., 523 F.3d 224, 231-32 (3d Cir. 2008) (quoting Ehleiter v. Grapetree Shores, Inc., 482 F.3d 207, 222-23 (3d Cir. 2007)).   It relies primarily on a recent opinion of the United States Court of

Appeals for the Third Circuit, White v. Samsung Electronics America, Inc., 61 F.4th 334 (3d Cir. 2023), in which the court held that the defendant had knowingly relinquished its right to arbitrate by acting inconsistently with that right insofar as it actively engaged in litigation for well over a year before moving to compel arbitration.   Id. at 339-41 (observing that defendant knew of the arbitration provisions, and yet "sought and agreed to delays in discovery," "pursue[d] motions to dismiss on the merits," "engaged in multiple instances of non-merits motion practice," "filed a motion for certification of an interlocutory appeal," and "participated in numerous court conferences").

JAF contends that this case is essentially indistinguishable from White and that we should therefore find that the Union, like the defendant in White, waived its right to arbitration.   While White did not arise in the labor context, a number of other cases have applied waiver principles in the context of a labor dispute involving a CBA containing an arbitration provision.   See, e.g., Coca-Cola Bottling Co. v. Soft Drink & Brewery Workers Union Loc. 812, 242 F.3d 52, 57 (2d Cir. 2001) (applying waiver principles but finding that union had not waived its right to enforce CBA's arbitration provision when it waited four months to raise issue, and distinguishing case from others in which party charged with waiver had engaged in more protracted litigation); Jones Motor Co. v. Chauffeurs, Teamsters & Helpers Loc. Union No. 633, 671 F.2d 38, 42 (1st Cir. 1982) (finding that union "has by its conduct in court waived any right that it might have to insist on arbitration" of employer's claim for damages from an illegal strike, because it answered complaint, engaged in discovery, and filed for summary judgment).

Most recently, in Sysco Minnesota, Inc. v. Teamsters Local 120, 958 F.3d 757 (8th Cir. 2020), the United States Court of Appeals for the Eighth Circuit stated that a party to a CBA "waives its right to [grievance and arbitration] procedures if it: (1) knew of its right to these

procedures, (2) acted inconsistently with that right, and (3) prejudiced the other party with these inconsistent acts."[3]   Id. at 762 (citation omitted).   With respect to the second factor, it explained that "[a] party acts inconsistently with its right to arbitrate if the party '[s]ubstantially invoke[s] the litigation machinery before asserting its arbitration right.'"   Id. at 762 (second and third alterations in original) (quoting Lewallen v. Green Tree Servicing, L.L.C., 487 F.3d 1085, 1090 (8th Cir. 2007)).   "A party substantially invokes the litigation machinery when, for example, it files a lawsuit on arbitrable claims, engages in extensive discovery, or fails to move to compel arbitration and stay litigation in a timely manner."   Id. (quoting Lewallen, 487 F.3d at 1090).   "To safeguard its right to arbitration, a party must 'do all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration.'"   Id. (quoting Lewallen, 487 F.3d at 1091).

In the instant case, the Union plainly knew of the arbitration provision in the CBA, which it negotiated, and explicitly asserted as an affirmative defense in its Answer to the Amended Complaint that JAF's "claims should be resolved by the grievance-arbitration procedure in the contracts."   (Answer, Docket No. 16, Affirm. Defenses ¶ 15); accord Sysco, 958 F.3d at 762 (stating that the first factor of the three-factor test was satisfied because the union "knew that it had a right to arbitration because it negotiated the CBA's terms and listed the CBA's grievance procedures as a defense to [the plaintiff's] breach claim in its answer").   Nevertheless, the Union moved to dismiss both JAF's initial Complaint and the Amended Complaint without seeking to enforce JAF's duty to grieve or arbitrate and, after answering the Amended Complaint, it took part

---

[3] The prejudice prong of this analysis is invalid after the Supreme Court's decision in Morgan v. Sundance, Inc., 596 U.S. 411 (2022), which held that a party arguing that its opponent has waived its right to arbitration by litigating need not establish that it was prejudiced by the delay.   Id. at 413-14.

in a Rule 16 Conference without moving either to compel arbitration or to stay the case pending exhaustion of the grievance and arbitration procedures.   (See Docket Nos. 8, 11.)   Thereafter, the Union actively participated in months of discovery and only raised JAF's failure to exhaust the grievance and arbitration procedures after discovery had concluded and it moved for summary judgment.   Under these circumstances, it seems plain that the Union did not "'do all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration.'"   Sysco, 958 F.3d at 762 (quoting Lewallen, 487 F.3d at 1091); see also White, 61 F.4th at 339-41 (requiring consideration of the circumstances and context of each case, and finding waiver where party acted inconsistently with an intent to arbitrate).   We therefore conclude that the Union acted inconsistently with its right to arbitrate by waiting until the summary judgment stage to litigate the issue and thus, the requirements for a finding of waiver are satisfied.

The Union contends, however, that its delay should be excused because it had no meritorious basis to demand arbitration until discovery revealed that JAF was not seeking tort damages.   By the Union's account, the Amended Complaint includes state law tort claims that the Union interfered with JAF's contractual relations with its customers, which are not arbitrable. The Union contends that it only concluded that arbitration was an option after JAF stated in its September 22, 2022 responses to interrogatories that it was no longer pursuing damages for its inability to meet contractual commitments because its mitigation efforts had enabled it "to fulfill [those] commitments until . . . the Union abandoned its unlawful efforts to disrupt the Company's business."   (Union Ex. L at 21.)   JAF maintains that it never asserted tort claims in this action and only sought monetary damages for reputational harm and damage to customer relations as contract damages that flowed from the Union's breach of the no-strike clause.   JAF therefore

argues that the Union's assertion that all of the claims in the lawsuit could not have been submitted to arbitration long before now is meritless.

Upon consideration of these opposing arguments, along with the Complaint and Amended Complaint, we conclude JAF never asserted tort claims in this action, but only asserted contract and declaratory judgment claims.   Moreover, even if JAF had asserted tort claims and then abandoned those claims in September of 2022, we would still find that the Union had waived its right to arbitration, because it provides no explanation as to why it did not seek to compel arbitration between September 22, 2022 and March 6, 2023, when it filed the instant summary judgment motion.   We therefore conclude that the Union has provided no valid excuse for its delay.

For the foregoing reasons, we conclude that the Union knowingly waived its right to enforce the grievance and arbitration provisions in Article 15 of the CBA, and we therefore reject the Union's argument that this case should be dismissed because JAF failed to exhaust its contractual remedies.

### B.    Merits Arguments

Having concluded that this case need not be resolved pursuant to the contractual grievance and arbitration procedures, we now address the Union's arguments that we should enter judgment in its favor on the merits   Specifically, the Union argues that: (1) the undisputed evidence demonstrates that the Union did not breach the no-strike clause; (2) the undisputed evidence demonstrates that the Union did not commit an anticipatory breach; and (3) we cannot grant a declaratory judgment regarding the meaning of Article V because there is no actual dispute regarding Article V's meaning.   We address these three arguments in turn.

### 1. Breach of contract

JAF's breach of contract claim is grounded on its assertion that the Union breached the CBA on May 1, 2021, when JAF drivers Whalin and Hammond called out of work.   (See 9/20/23 Hrg. Tr. at 14-15.)    JAF contends that the actions of these two workers constituted a strike in violation of the CBA's no-strike clause.   The Union seeks summary judgment on this claim, arguing, inter alia, that the conduct of these two workers did not constitute a strike under the LMRA and the CBA.

Section 501(2) of the LMRA defines the term "strike" as "any strike or other concerted stoppage of work by employees (including a stoppage by reason of the expiration of a collective bargaining agreement) and any concerted slowdown or other concerted interruption of operations by employees."   29 U.S.C § 142(2).   While Congress has provided this definition, "[t]here is . . . no magic appellation indispensable to a judicial determination that a union has engaged in a strike." Adley Express Co. v. Highway Truck Drivers & Helpers, Loc. No. 107, 349 F. Supp. 436, 442 (E.D. Pa. 1972).   The Third Circuit has stated that "'strike' is generally understood to mean a cessation of work by employees, accompanied by picket lines which in combination impair or prevent production in all of the employer's premises."   Jones & Laughlin Steel Corp. v. United Mine Workers of Am., 519 F.2d 1155, 1158 (3d Cir. 1975); see also Sheet Metal Workers' Int'l Ass'n AFL-CIO v. N.L.R.B., 989 F.2d 515, 520 (D.C. Cir. 1993) (quoting Jones & Laughlin Steel Corp., 519 F.2d at 1158).   Similarly, the Adley Express court has found there to be a strike where there was "a concerted [city-wide] work stoppage, recommended by the Union's officers, voted unanimously by the business agents and the rank and file, implemented by the failure of the Union membership to report for work, and resulting in cessation of business operations of the employers." Adley Express Co., 349 F. Supp. at 442; id. at 440 (characterizing the work stoppage as city-wide).

Meanwhile, the United States Court of Appeals for the Eleventh Circuit has stated that "the commonly understood definition of 'strike' in a labor context is 'a temporary stoppage of work by a body of workers designed to enforce compliance with demands (as changes in wages, hours, or working conditions) made on an employer.'"   Dunn v. Air Line Pilots Ass'n, 193 F.3d 1185, 1194 (11th Cir. 1999) (quoting Webster's Third New International Dictionary 2262 (1986)).   What is clear is that we must consider "substance over formality," so that a "'cessation of work by a group is no less a strike because the group may not have labeled it a strike, or engaged in the additional activities which usually accompany a strike.'"   Adley Express Co., 349 F. Supp. at 442 (quoting In re Massey Gin & Machine Works, Inc., 78 N.L.R.B. 189, 190 (1948)).   Likewise, where "none of the employees of plaintiffs are working," a strike has occurred, and it does not matter if "no strike has been formally voted."   Id. (quoting Favino Mech. Constr. Ltd. v. Loc. 269, Plumbing & Pipefitting Indus., 66 CCH Lab. Cas. ¶ 12,180 (S.D.N.Y. 1971)).

In this case, it is undisputed that only two of 29 Union drivers scheduled to work on May 1, 2021, failed to report to work as scheduled that day.   (Jt. Facts ¶¶ 112-13.)   While both drivers who did not report as scheduled–Paul Whalin and Michael Hammond–testified at their depositions that they did not go to work because they thought the Union was striking, JAF conceded at argument that the two workers were mistaken.   (9/20/23 Hrg. Tr. at 17; see also Hammond Dep. at 38 (testifying that he did not report to work on May 1, because he thought there was a strike, but that turned out to be a misunderstanding).)   Indeed, the workers testified that the sign for a strike was a giant inflatable rat in front of the workplace, and it is undisputed that no giant inflatable rat was present on May 1, 2021.   (Jt. Facts ¶¶ 111, 121-22.)   Whalin also specifically testified that the Union had not directed workers not to come to work, but had only told them not to cross any picket line that was set up.   (Whalin Dep. at 38.)

The undisputed facts also make clear that Hammond and Whalin did not act in concert "to enforce compliance with demands . . . made on [JAF]." <u>Dunn</u>, 193 F.3d at 1194; <u>see also</u> 29 U.S.C § 142(2) (defining a strike as "concerted" action).   Indeed, Whalin testified at his deposition that his failure to show up at work on May 1 was not because he was participating in a strike to force action by JAF but, rather, was because he did not want to be involved in any strike activity.   (<u>See</u> Whalin Dep. at 28, 38-39.)   Specifically, Whalin testified that he thought that the Union was striking that day because it had been "talking about" a strike and he "figured, like I don't want to be there and do all of this," so he called out instead.   (Jt. Facts ¶ 130; Whalin Dep. at 28.)   As he explained, he "personally just didn't want to be there . . . if [a strike] was happening." (Whalin Dep. at 38-39.)   Thus, the undisputed evidence is that Whalin failed to report to work on May because he wanted to avoid engaging in strike activity, not to strike in concert with others.

For his part, Hammond testified that he arrived at work forty-five minutes late on May 1, and that when he got there, people were "kind of confused," "some people went [in]," and "some people didn't," but then someone told all of them to "Go there and take your routes."   (Hammond Dep. at 27-28; <u>see also</u> <u>id.</u> at 28 ("[T]hey were telling people to, 'Take your routes out.'").)   At that point, Hammond went "up to the window" and told Stocklin that he was late because he thought they were supposed to strike, but it looked like that hadn't happened.   (<u>Id.</u> at 26-27.) Hammond also testified that he had only one conversation about the strike with shop steward Tony Polis sometime between April 25 and May 1, and Polis told him that there was no set date for a strike, but that if he got to work and saw the rat, that meant there was a strike.   (<u>Id.</u> at 23-25.) Hammond had no other conversations with, and exchanged no texts with, any other union members about the purportedly planned strike.   (<u>Id.</u> at 25-26.)   Thus, the record evidence supports only the

conclusion that Hammond did not act in concert with anyone else in failing to report as scheduled on May 1,[4] and that he realized upon arrival at work that no strike was occurring.

In light of the above evidence, we can only conclude that there was no strike on May 1, 2021, because there was no "concerted" work stoppage or slowdown, 29 U.S.C § 142(2), "designed to enforce compliance with demands," Dunn, 193 F.3d at 1194, which "impair[ed] or prevent[ed] production in all of the employer's premises," Jones & Laughlin, 519 F.2d at 1158. To the contrary, although there had been talk of a strike occurring leading up to May 1, 2021, that strike did not come to pass as the Union did not put out the agreed-upon strike signal (the inflatable rat), workers were told on May 1, 2021 to "take [their] routes," 27 of 29 drivers reported to work as scheduled, and the only two drivers who did not report as scheduled either admitted that they had been wrong about a strike occurring or only failed to show to avoid participating in any strike activities.   There is also no evidence that the loss of two drivers on May 1, 2021 did—or even

---

[4] JAF argues that concerted action need not involve more than two employees and that the actions of Whalin and Hammond therefore qualify as "concerted."   See In re Root-Carlin, Inc., 92 NLRB 1313, 1314 (1951) (stating that one employee talking "with fellow employees relative to the need for union organization constituted concerted activity for their mutual aid or protection within the meaning of Section 7 of the [National Labor Relations] Act ['NLRA']," which protects a Union's right to organize and engage in concerted activity, and adding that "concerted activity . . . in its inception involves only a speaker and a listener").   While we do not doubt that just two individuals can act in concert, it is also plain that actions cannot be concerted in the absence of some agreement or common goal.   See In re Fresh & Easy, LLC, No. 15-12220, 2016 WL 5922292, at *4 (Bankr. D. Del. Oct. 11, 2016) (observing that, at the time the NLRA was passed, the 1933 edition of the Oxford English Dictionary defined "concerted" as "arranged by mutual agreement; agreed upon, pre-arranged; planned, contrived; done in concert" and defined "concert" as an "agreement of two or more persons or parties in a plan, design, or enterprise; union formed by such mutual agreement," and further observing that Black's Law Dictionary defines "concerted activity" as "action by employees concerning wages or working conditions; esp., a conscious commitment to a common scheme designed to achieve an objective" (citations omitted)).   Here, there is no evidence that Whalin and Hammond coordinated with one another in any way, reached any sort of agreement, or were acting with any common objective.   Accordingly, no reasonable jury could find on the basis of the summary judgment record that they were acting in concert.

could have—impaired or prevented all production at JAF's facility. (See K. Ambrogi Dep., Union Ex. O, at 71 (testifying that, on May 1, 2021, there were no products that were not delivered to customers and no orders that were not fulfilled).) Accordingly, focusing on "substance over formality," Adley, 349 F. Supp. at 442, while construing the evidence in the light most favorable to JAF, we conclude that no reasonable factfinder could find that a strike occurred on May 1, 2021. We therefore grant the Union's Motion for Summary Judgment insofar as it seeks judgment in its favor on JAF's breach of contract claim.[5]

### 2. Anticipatory breach

JAF's anticipatory breach of contract claim is grounded on its assertion that the Union announced prior to May 1 that it was going to strike in breach of the no-strike clause. The Union argues in its Motion that we should grant judgment in its favor on this claim because the record evidence does not support a claim for anticipatory breach.[6] As a general matter, an anticipatory

---

[5] The Union has also argued that we should enter judgment in its favor on JAF's breach of contract claim because JAF has not shown that it incurred any damages as a result of the alleged strike. The Union reasons that JAF's principal damages, i.e., the amount that JAF spent on security and replacement workers in anticipation of a strike, were not proximately caused by Whalin's and Hammond's failure to report to work, emphasizing that JAF paid non-refundable deposits to STS and LMC before May 1 and that the additional amounts that JAF paid to those companies was not necessary either to cover Whalin's and Hammond's routes or to ensure a safe workplace that day. While these arguments are far from frivolous, we need not reach them because we grant the Union's Motion for judgment in its favor on the breach of contract claim on the alternative basis set forth above.

[6] The Union also argues that JAF cannot establish breach of contract based on an anticipatory breach of contract theory at this stage of the litigation because the Amended Complaint alleges solely that a breach has already occurred and that JAF suffered damage as a result. (See Am. Compl. ¶¶ 40-41, 43 (alleging that "[t]he Union . . . has instigated and will continue to instigate intermittent strikes and/or stoppages of work" and "has therefore violated the CBA's prohibition against strike" and "cause[d] damages" to JAF).) However, while the Amended Complaint is less than a model of clarity, it is plain from its allegations that JAF has always claimed that the Union was threatening to breach the no-strike provision of the CBA, that JAF believed that the Union was going to strike, and that JAF took protective action as a result. (Am. Compl. ¶¶ 35-36, 42 (alleging that the Union's "threats of intermittent strikes will cause (and

breach or repudiation of a contract occurs when an obligor makes "a statement . . . to the obligee indicating that the obligor will commit a breach that would itself give the oblige a claim for damages for total breach."   Restatement (Second) of Contracts § 250 (1981); see also 23 Williston on Contracts § 63:29 (4th ed. 2023) ("A repudiation is a statement by the obligor to the obligee indicating that the obligor will commit a breach that would itself give the obligee a claim for damages for total breach.").)   "To state a claim for anticipatory repudiation of a labor agreement governed by Section 301 of the LMRA, a plaintiff must allege that the defendant made 'a positive, unconditional, and unequivocal declaration of a fixed purpose not to perform the contract in any event or at any time.'"   Int'l Brotherhood of Teamsters, Loc. 848 v. MV Transp. Inc., Civ. A. No. 19-5849, 2021 WL 4582107, at *8 (C.D. Cal. Mar. 12, 2021) (quoting Minidoka Irrigation Dist. v. Dep't of Interior, 154 F.3d 924, 926 (9th Cir. 1998)) (additional citation omitted); see also Restatement (Second) of Contracts § 250 cmt. B ("[A] party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform.") "Doubtful and indefinite statements that performance may or may not take place are not enough to constitute anticipatory repudiation [of a CBA]."   U.S. Soccer Fed'n, Inc. v. U.S. Women's Nat'l Soccer Team Players Ass'n, 190 F. Supp. 3d 777, 787 (N.D. Ill. 2016) (quotation omitted).[7]

---

have caused) significant damages" and that the Union's actions constitute a "repudiation of the CBAs").   Indeed, JAF filed its original Complaint in this action in April of 2021, before the alleged strike on May 1, 2021, when it was undoubtedly pleading anticipatory breach, and the phrasing of the breach of contract count did not change significantly in the Amended Complaint. Moreover, the fact that the Union moved for summary judgment on an anticipatory breach claim, "predict[ing] that [JAF] would assert a claim for anticipatory breach of contract," demonstrates that it too understood anticipatory breach to be one of JAF's theories of liability.   (Union Mem. in Supp. of Summ. J. Mot. at 42.)   Accordingly, we do not consider JAF's claim for anticipatory breach to be a new claim or theory introduced in opposition to the Union's Motion for Summary Judgment.

[7] The parties have not cited any, and we are aware of no, Third Circuit precedent defining anticipatory breach in the LMRA context or, more generally, under federal common law.   The

Following argument on September 20, 2023, we invited JAF to file a supplemental brief,

identifying the specific evidence in the record that supports its claim of anticipatory breach.   In

response, JAF points to the following record evidence.   First, on February 12, 2021, Bryan wrote

an email to JAF President Kristy Ambrogi, which stated as follows:

> I have referred Your Attorney's correspondence to our council [sic]
> for reply[.]   Your Attorney[']s letter is directly from the Union
> busting playbook.   Rest assured[,] Local 729 will take every lawful
> action available to protect our Jurisdiction.   That being said[,]
> unless [w]e have a successor agreement in place by the expiration
> date of the Kristy Kuts CBA[,] Local 929 will commence strike
> action against Your organization up to and including extending
> picket line whenever and wherever necessary.

(Rocky Bryan email, Ex. A to Union's Suppl. Br. in Supp. of Mot. for Summ. J., Docket No. 38,

at 1; see also Jt. Facts ¶¶ 41-42.)   Thereafter, in March of 2021, shop stewards Tony Polis and

Greg Palestini had a conversation with Kristy Ambrogi, Stocklin, Blimm, and Michael Ambrogi

---

Union points out that the Third Circuit, applying Pennsylvania law outside of the labor context, has stated that "[t]o constitute anticipatory breach . . . there must be an *absolute* and *unequivocal* refusal to perform or a distinct and positive statement of an inability to do so."   Edwards v. Wyatt, 335 F.3d 261, 272 (3d Cir. 2003) (quotation omitted).   "[M]ere expression of doubt as to . . . willingness or ability to perform is not enough to constitute a repudiation . . . ."   Id. at 273 (first omission in original) (quoting Restatement (Second) of Contracts § 250 cmt. b); see also Mobley v. New York Life Ins. Co., 295 U.S. 632, 638 (1935)) ("Repudiation by one party, to be sufficient in any case to entitle the other to treat the contract as absolutely and finally broken and to recover damages as upon total breach, must at least amount to an unqualified refusal, or declaration of inability, substantially to perform according to the terms of his obligation." (citations omitted)). This is consistent with our understanding of federal common law.   See City of Fairfax v. Washington Metro. Area Transit Auth., 582 F.2d 1321, 1327 (4th Cir. 1978) (describing anticipatory breach under federal common law as "a positive, unconditional, and unequivocal declaration of fixed purpose not to perform the contract in any event or at any time" (quoting Dingley v. Oler, 117 U.S. 490, 502 (1886)).   It is also consistent with the standard that the United States District Court for the Central District of California applied in MV Transp. Inc. when considering an anticipatory breach of a CBA.   Accordingly, the Third Circuit's decision in Edwards provides some relevant guidance here.

about a "potential strike occurring."[8]   (Jt. Facts ¶ 56 (citing Palestini Dep. at 48).[9])   On April 19, 2021, Polis and Palestini again "discussed strikes" with Kristy Ambrogi, Stocklin, Blimm, and Michael Ambrogi.  (Id. ¶ 58.)  Eight days later, on April 27, 2021, JAF driver/assistant shop steward Jimmy Sparks and Stocklin discussed employees not reporting to work during the planned strike and "Sparks' understanding from Union President Rocky Bryan that JAF employees would be fined or expelled from the Union if they came to work during the Union's planned strike."  (Id. ¶ 60.)

JAF contends that the record evidence that the Union filed paperwork with Teamsters International to obtain approval for a May 1 strike is "perhaps most telling."  (JAF Suppl. Mem. at 7; Jt. Facts ¶¶ 62-75.)  This paperwork was necessary in order for Kristy's Kuts and JAF employees to receive payment from the Union during any strike.  (Jt. Facts ¶¶ 63-66.)  On April 8, 2021, Bryan submitted the SBA2, which requested approval of strike benefits assistance for a proposed May 1 strike against Kristy's Kuts and JAF.  (Id. ¶¶ 70, 72-73.)  Five days later, on April 13, 2021, Bryan submitted an SBA1 form to notify the International Brotherhood of Teamsters of a pending strike and to request recognition of the strike.  (Id. ¶¶ 62-63.)

JAF also relies on the record evidence that shortly after applying for strike funds, the Union notified employees of the pending strike.  JAF specifically relies on evidence that, at Bryan's

---

[8] JAF asserts in its brief that "[t]hroughout March and April 2021, Polis had additional discussions with Stocklin regarding Bryan Jr.'s intention on behalf of the Union to strike JAF." (JAF's Suppl. Mem. in Opposition to Union's Mot. ("JAF Suppl. Mem."), Docket No. 38, at 7.) In support of that assertion, it cites paragraph 3 of its Statement of Additional Facts.  However, that paragraph contains no citation to the record evidence.  (See JAF Stmt. of Add'l Facts, Docket No. 35-1, at ¶ 3.)  Accordingly, JAF has provided no record support for its contention that Polis had additional discussions with Stocklin throughout March and April regarding the Union's intention to strike, and we disregard that assertion.

[9] Although the Joint Facts cite to the Palestini deposition transcript, we have been unable to locate that transcript in the summary judgment record.

direction, the Union prepared and mailed a flyer to employees, entitled "Update Notice of Pending

Strike," which announced an "Open Meeting for All Employees of AMBROGI FOODS and

KRISTY'S KUTS" on April 25, 2021.  (Id. ¶¶ 80, 82.)  Bryan told members at the April 25

meeting that "the Union may initiate a strike."  (Id. at 15 ¶ 86.)  Hammond testified at his

deposition that, at the April 25 meeting, Bryan told members that the union was going to strike

and that "if [members] don't participate in the strike, [they're] not going to get to be in the union."

(Id. ¶ 93 (alterations in original); Hammond Dep. at 18-19; see also Whalin Dep. at 21 (testifying

that Bryan said something about striking at the meeting).)  Stocklin testified that other JAF

employees—namely, Tony Polis, Jimmy Sparks and Greg Girard—told him around the time of

the meeting that they understood that they could be fined or kicked out of the union if there was a

picket line or strike that they did not honor.  (Stocklin Dep., Union Ex. B, at 77-79.)  Finally,

JAF notes that Bryan "posted a green flyer on the Union's bulletin cork board at the Philadelphia

Market stating, 'On Saturday May 1st Local 929 Will be Picketing J. Ambrogi Food.'"[10]  (Jt.

Facts ¶ 94.)

        JAF argues that this specified evidence demonstrates that the Union communicated a

positive, unconditional, and unequivocal intention to strike, in violation of the parties' CBA or

that, at a minimum, the evidence creates a genuine issue of material fact as to whether the Union

---

[10] In support of its anticipatory breach claim, JAF also points to an April 30, 2021 newspaper article reporting that JAF had filed instant action against the Union.  That article recounts that Rocky Bryan stated that "he will move forward with the picket line on May 2 as planned."  Christen Smith, *Philadelphia Union Sued for Planned Strike*, The Center Square (Apr. 30, 2021), https://www.thecentersquare.com/pennsylvania/article_9a830e30-a9ee-11eb-b484-0b41aaa15cfd.html, archived at https://perma.cc/6MDJ-FZXY.  However, because that article was published after JAF brought this April 26, 2023 action asserting that the Union had anticipatorily breached the contract, we conclude that Bryan's statement cannot constitute the "positive, unconditional, and unequivocal declaration of a fixed purpose not to perform the contract" on which JAF's claim of anticipatory breach is based.  MV Transp. Inc., 2021 WL 4582107, at *8.

committed an anticipatory breach.   However, the only identified evidence of an official communication from the Union to JAF regarding a possible strike is Rocky Bryan's February 12, 2021 email to Kristy Ambrogi, a full two-and-a-half months before May 1, 2021.   (Jt. Facts ¶¶ 41-42.)   As noted above, Bryan stated in that email that the Union "will take every lawful action available to protect [its] Jurisdiction" and that "unless [w]e have a successor agreement in place by the expiration date of the Kristy Kuts CBA," which was expiring on April 31, 2021, the Union "will commence strike action against Your organization up to and extending picket line whenever and wherever necessary."   (Id. ¶ 42; Rocky Bryan email at 1.)   Thus, the strike threat in that letter is not only remote, but also explicitly conditional because it is, by its terms, contingent upon there being no successor agreement in place with Kristy's Kuts on April 31, 2021.   Furthermore, even assuming *arguendo* that the email communication could be reasonably construed as a "positive, unconditional, and unequivocal declaration of a fixed purpose" to strike in violation of the no-strike clause, no jury could reasonably conclude that the declaration was not retracted—or, at a minimum, rendered equivocal–on March 29, 2021, a full month before the expiration of the Kristy's Kuts CBA, when the Union's counsel wrote to JAF that "[t]he Union has made no threat of engaging in a strike or slowdown."   (Jt. Facts ¶ 54); see Restatement (Second) of Contracts § 256 ("The effect of a statement as constituting a repudiation under § 250 . . . is nullified by a retraction of the statement . . . .").   Accordingly, we conclude that the record cannot support a reasonable conclusion that this February 12, 2021 email constituted "a positive, unconditional, and unequivocal declaration" to JAF "of a fixed purpose" to strike on May 1, 2021.   MV Transp. Inc., 2021 WL 4582107, at *8 (quotation omitted).

In the absence of any direct and unequivocal communication from Union leadership to JAF that the Union was going to strike, JAF relies on other information that it either gleaned from JAF

employees prior to May 1, 2021, or learned subsequently.   Most notably, JAF argues that the Union's application for strike benefits was a declaration that it would be striking.   However, it is plain that the mere planning for a potential strike cannot reasonably be construed as "a positive, unconditional, and unequivocal declaration" that a Union <u>will</u> strike, particularly where there is no record evidence that the Union was under any obligation to use the strike benefits for which it had applied.   There is also no evidence in the record that JAF was even aware of the Union's application for strike benefits prior to May 1, so no reasonable jury could find that the Union's request for strike benefits constituted an unequivocal statement by the Union on which JAF's anticipatory breach claim is based.[11]   (<u>See</u> K. Ambrogi Dep., Union Ex. O, at 98 (testifying that she did not know about Bryan's application for strike benefits when JAF entered into a contract with LMC on April 27, 2021 for security services); Blimm Dep. at 109-10, Union Ex. C, at 109-10 (testifying that he was not aware of Bryan's application for strike benefits before May 1, and did not know if any other manager was aware of that application before May 1).)

JAF also points to evidence of information that it received from conversations with Union workers prior to May 1, 2021.   The bulk of that information, however, was explicitly conditional and equivocal.   So, for example, Polis and Palestini told Kristy Ambrogi, Stocklin, Blimm, and Michael Ambrogi on March 1, 2021, that there was a "potential strike" (Jt. Facts ¶ 56 (citing Palestini Dep. at 45)); Polis told Stocklin that "<u>if they did strike</u>, . . . he could be kicked out of the

---

[11] JAF may be arguing that the Union's application for strike benefits was an action that, in its own right, constituted a repudiation of the CBA.   However, in order for a "voluntary affirmative act" to constitute a repudiation, the act must "render[] the obligor unable or apparently unable to perform" its contractual obligations.   Restatement (Second) of Contracts § 250 (1981).   Here, there is no suggestion that the Union's application for strike benefits rendered it unable or apparently unable to forego a strike.   Accordingly, no reasonable jury could find that the application for strike benefits was a "voluntary affirmative act" that, in its own right, constituted an actionable repudiation of the CBA.

union or fined" (Stocklin Dep. at 77 (emphasis added)); and Sparks told Stocklin that "if there's a picket line, [union workers] could be fined" for not honoring the picket line (id. at 79 (emphasis added)).   No reasonable jury could therefore conclude that these communications about the mere possibility of a strike conveyed to JAF that the Union had made a positive and unconditional declaration that it would strike.

We further note that these oral communications on which JAF relies were made by Union workers who, pursuant to the terms of the CBA, had no authority to speak on behalf of the Union concerning strikes.   Indeed, although Sparks, Polis, and Palestini were shop stewards (Jt. Facts ¶ 13), the CBA specifically states the following with respect to their authority to speak on the Union's behalf:

> The authority of shop stewards . . . shall be limited to, and shall not exceed, the following duties and activities:
>
> \*   \*   \*
>
> c.   The transmission of such messages and information which shall originate with, and are authorized by the Local Union or its officers, provided such messages and information
>
>> 1.   Have been reduced to writing, or
>> 2.   If not reduced to writing, are of a routine nature and do not involve work stoppage, slowdowns, refusal to handle goods, or any other interference with the Employer's business.

(CBA at Art. 8 ¶ 2.)   There is no evidence in the summary judgment record that the communications from Sparks, Polis, and Palestini that concerned a potential work stoppage or slowdown had been either authorized by the Union or reduced to writing.   Thus, even if certain of those communications could be characterized as "positive, unconditional, and unequivocal declaration[s]" of a strike, they could not support a conclusion that the Union had made such a

declaration and thereby anticipatorily breached the CBA.[12]   (See Jt. Facts ¶ 27 (stating that JAF

shall not hold the Union liable for unauthorized acts of stewards (quoting CBA Art. 8 ¶ 4).)

Finally, JAF argues that the Union communicated an unconditional and unambiguous

intention to strike on May 1, 2021 by (1) mailing to employees, in mid-April 2021, a flyer entitled

"Update Notice of Pending Strike" announcing an April 25, 2021 meeting, and (2) posting in the

Philadelphia Market on April 25, 2021, a green flyer announcing May 1 picketing.   However,

the "Update Notice of Pending Strike," while using the phrase "pending strike," merely announced

that the Union was holding an open meeting for all employees on April 25, 2021, and stated

nothing about when any "pending strike" might occur.   (Update Notice, JAF Ex. B.)   Meanwhile,

the green flyer, which was posted on April 25, 2021, did not even mention a strike, stating only

that the Union would be picketing at JAF on May 1 and asking union members to "STOP BY AND

SHOW [THEIR] SUPPORT."   (Green flyer, JAF Ex. C.)   Moreover, by JAF's own account, the

Union had been "doing the normal picketing that they . . . do . . . many times before May 1,"

making clear that any announcement of picketing alone did not amount to an announcement of a

strike.   (Stocklin Dep. at 36-37.)   Consequently, we conclude that no reasonable jury could find

that either of these flyers, which were not even directed to JAF, but rather, were communications

from the Union to its membership, announced a "positive, unconditional, and unequivocal

declaration" that the Union would be striking.

In the absence of any positive, unconditional, and unequivocal declaration of a strike from

---

[12] JAF argues that Polis was not only a shop steward, but also a Union trustee.   However, the only evidence in the record is that Polis's additional responsibility as a trustee was to ensure that financial statement were accurate.   (See Polis Dep. at 13.)   Accordingly, there is no evidence that, as a trustee, he had authority to declare a strike, convey information to JAF about strikes, or otherwise control the Union's compliance with the CBA.   We therefore do not find, based on the record before us, that Polis's trustee position granted him any greater authority to speak on behalf of the Union on the topic of strikes and work stoppages than did his position as shop steward.

the Union, JAF attempts to piece together evidence that the Union nevertheless intended to strike, pointing out, inter alia, that the green flyer announced May 1 picketing, and that union workers told Stocklin that Bryan had directed that if there was picketing, they were not to cross the picket line.   However, JAF's subjective interpretation of events based on workplace rumors and intermediary accounts simply cannot serve as a replacement for the "positive, unconditional, and unequivocal declaration" from the Union that the law requires.[13]   MV Transp. Inc., 2021 WL 4582107, at *8; Edwards, 335 F.3d at 272 (stating that "[t]o constitute anticipatory breach . . . there must be an *absolute* and *unequivocal* refusal to perform or a distinct and positive statement of an inability to do so" (quotation omitted)); see also id. at 273 n.9 (stating that the obligee's "subjective belief does not suffice to demonstrate repudiation"); (see also Stocklin Dep. at 80 (testifying that he asked Polis and Palestini "what the rumors were with the pending strike coming up").)   And, indeed, the record ultimately makes clear that JAF's subjective interpretation of events was flatly incorrect as May 1, 2021 came and went and, as explained at length above, the Union did not strike.

Accordingly, for all of these reasons, we conclude that no reasonable jury could conclude, based on the undisputed record evidence and other facts in the record viewed in the light most favorable to JAF, that the Union anticipatorily breached the CBA by declaring unequivocally and unconditionally that it would strike on May 1, 2021.   We therefore grant the Union's Motion for Summary Judgment insofar as it seeks judgment in its favor on JAF's claim for anticipatory breach.

---

[13] Stocklin made clear that he was relying entirely on rumors and third-party accounts regarding a potential strike as he testified that he met with Union officers in April of 2021, but never sought out information from them regarding the "Update Notice of Pending Strike," strike rumors, or any pending strike.   (Stocklin Dep. at 81-85.)

### 3. Declaratory Judgment

In Count Two of the Amended Complaint, JAF seeks a declaration that "Article 5 of the CBA[] does not permit the Union to order, maintain, sanction or permit a strike or stoppage of work at JAF." (Am Compl. ¶ 50.) The Amended Complaint indicates that such a declaration is necessary because "[t]he Union, through its counsel, has incorrectly claimed that Article 5 permits the Union to cause a strike and/or stoppage of work in violation of Article 15 Section 3 by establishing a picket line at JAF and threatening employees [with penalties] if the employees cross such picket line."[14] (Id. ¶ 49.) The Union argues in its Motion that this claim does not present an actionable case or controversy.

The Declaratory Judgment Act provides that, "[i]n a <u>case of actual controversy</u> . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a) (emphasis added). A "case of actual controversy" is a dispute that is "definite and concrete, touching the legal relations of parties having adverse legal interests" and that is "real and substantial." <u>MedImmune, Inc. v. Genentech, Inc.</u>, 549 U.S. 118, 127 (2007) (quoting <u>Aetna Life Ins. Co. v. Haworth</u>, 300 U.S. 227, 240-41 (1937)). "Basically, the question in each case is

---

[14] Article 5 states:

> It shall not be a violation of this Agreement, and it shall not be cause for discharge or disciplinary action nor shall such employee be permanently replaced in the event an employee refuses to enter upon any property involved in a primary labor dispute, or refuses to go through or work behind any primary picket line, including the primary picket line of Unions party to this Agreement, and including primary picket lines at the Employer's places of business.

(CBA, Union Ex. E, at Art. 5 ¶ 1.) In a March 29, 2021 letter to JAF, the Union's counsel wrote: "In your letters, you . . . claim that a strike would violate the collective bargaining agreement. Article 5 clearly states that it is not a violation of the agreement if employees refuse to enter property or cross a picket line of an employer with whom the Union is involved in a labor dispute." (Jt. Facts ¶ 55.)

whether . . . , under all the circumstances, . . . there is a substantial controversy, between parties

having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment."   Id. (quoting Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270,

273 (1941)).

In this case, JAF has presented no evidence that the Union is currently threatening to cause

a strike and/or stoppage of work by establishing a picket line and threatening employees with

penalties if the employees subsequently cross the picket line, or is currently arguing that Article V

permits it to do so.   Indeed, at oral argument on the Union's Motion, JAF did not mention any

such current threat, and the only evidence of the Union taking the disputed position regarding the

meaning of Article V is the March 29, 2021 letter from Union counsel.   (JAF Mem. in Opposition

to Summ. J. Mot., at 25-26 (citing Jt. Facts ¶ 55).)   Moreover, on September 8, 2022, JAF stated

in response to the Union's Interrogatories that "the Union [had] abandoned its unlawful efforts to

disrupt the Company's business."   (Union Ex. L at 21.)   Consequently, we can only conclude that

the purported dispute of the parties as to the meaning of Article V is not of "sufficient immediacy

. . . to warrant the issuance of a declaratory judgment."   MedImmune, Inc., 549 U.S. at 127.   We

therefore grant the Union's Motion for Summary Judgment insofar as it seeks judgment in the

Union's favor on JAF's declaratory judgment claim.

## IV.    CONCLUSION

For the foregoing reasons, we grant the Union's Motion for Summary Judgment in its

entirety, and we enter judgment in the Union's favor and against JAF.   An appropriate Order

follows.

BY THE COURT:
/s/ John R. Padova, J.

_____
John R. Padova, J.